**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
HI-TECH PHARMACAL CO, INC.,

                             **Plaintiff,**                 **MEMORANDUM**
                                                           **and ORDER**

        -against-

                                                       **05-CV-2674 (ARR)(SMG)**

HI-TECH PHARMACEUTICALS, INC.,

                              **Defendant.**
-------------------------------------------------------------------X
*Gold, S., United States Magistrate Judge*

## I. Introduction

        Plaintiff, Hi-Tech Pharmacal, a manufacturer of generic and branded drugs and

dietary supplements, brings this action for trademark infringement, unfair competition, and false

designation of origin under Section 43(a) of the Lanham Act, codified at 15 U.S.C. §1125(a).

Compl. ¶ 13. Plaintiff alleges that defendant, a manufacturer primarily of dietary supplements,

infringes its trademark. Plaintiff contends that defendant's mark, "Hi-Tech Pharmaceuticals," is

so similar to plaintiff's mark that it causes confusion and mistake, and leads customers to believe

that plaintiff is the source of defendant's products. Plaintiff also brings various claims under

New York State law.

        Plaintiff and defendant now cross-move for summary judgment on the federal claim, and

defendant moves for summary judgment on plaintiff's state law claims. By stipulation dated

November 14, 2006, the parties consented to have me decide their respective motions. Docket

Entry 32. I held oral argument on May 10, 2007. For the following reasons, the parties' cross-

motions for summary judgment on plaintiff's Lanham Act claim are denied; defendant's motion

for summary judgment on plaintiff's state law claim for dilution is denied; and defendant's

motion for summary judgment on plaintiff's claims for unfair competition, misappropriation, and unfair and deceptive trade practices is granted.

## II. Facts

A. Hi-Tech Pharmacal

Hi-Tech Pharmacal ("Hi-Tech") makes and sells prescription pharmaceuticals, over-the-counter health and medical products, and vitamins and mineral supplements. Declaration of David Seltzer ("D. Seltzer Decl.") ¶ 2. Vitamins and minerals are defined as dietary supplements by the Food and Drug Administration ("FDA"). Declaration of Michael F. Sarney ("Sarney Decl."), Ex. 1. Hi-Tech's products include both generic and branded dietary supplements and prescription and over-the-counter drugs, as well as contract and private label products. Deposition of David Seltzer ("D. Seltzer Dep.") at 46; D. Seltzer Decl. ¶¶ 2-3, Exs. 2-3.

Hi-Tech's generic products make the most prominent use of the company's trade name. The packaging for Hi-Tech's generic products, which include eye drops, vitamin drops, and cough syrup, features the "Hi-Tech Pharmacal" company logo but no drug-specific "brand" name. D. Seltzer Decl., Ex. 7. The branded products, which include products such as a sugar-free cough syrup marketed under the name Diabetic Tussin and a prescription analgesic sold under the name Naprelan, do not have the "Hi-Tech Pharmacal" logo on their label. Rather, these products are marketed under a name specific to each item, but the packaging does indicate that they are made and distributed by Hi-Tech. D. Seltzer Decl. ¶ 10.

Hi-Tech has employed the "Hi-Tech Pharmacal" mark since 1983. *Id.* ¶ 2. It has marketed over-the-counter health products, vitamins, and minerals under that name since 1983, and pharmaceutical products under it since 1984. *Id.* In addition to its inclusion on product

packaging and labels, the name "Hi-Tech Pharmacal" also appears on product catalogs, order forms, price lists, invoices, annual reports, and advertisements.[1] *Id.* ¶¶ 10-22 *and accompanying exhibits*. The typical display of the name seems to be the word "Hi-Tech" in large white lettering in a rectangle against a teal colored background, with the word "Pharmacal" appearing in smaller, more simple black lettering below. *See* http://www.hitechpharm.com/prod.htm (last visited June 13, 2007). This mark appears in the upper left-hand corner of many of plaintiff's generic products. *Id.* Although plaintiff has registered other names, it has not registered the "Hi-Tech Pharmacal" mark with the United States Patent and Trademark Office ("PTO"). D. Seltzer Decl. ¶ 4.

In 2005, Hi-Tech's net sales were approximately $68 million. *Id.* ¶ 6. This amount constitutes less than 1% of industry revenues. Def.'s 56.1 Statement at 10, Def.'s Resp. 14. Hi-Tech's generic product business accounted, very roughly, for 80-85% of this figure, including some contract manufacturing products. D. Seltzer Dep. at 49, ll. 3-19. Hi-Tech does not sell its generic products directly to end users or consumers, but only to major distributors, wholesalers, and chains throughout the United States, such as Rite Aid, CVS, Wal-Mart, Walgreen's, Eckerd, Safeway, and Albertsons. Deposition of Edwin A. Berrios ("Berrios Dep.") at 45, ll. 20-22; Declaration of Edwin A. Berrios ("Berrios Decl.") ¶¶ 2, 4-5; Def.'s 56.1 Statement at 10, Def.'s

---

[1] Defendant lists what it describes as "multiple" inconsistent names, logos, and domain names that the plaintiff has employed on product labels, in company materials, and otherwise in the course of its business, including: "Hi-Tech Pharmacal," "Hi-Tech," "H-T," "hitechpharm.com," "hitkeb@bellsouth.net," "R$_x$ Choice," "Steri-Med," "R$_x$ Steri-Med," and "Health Care Products." Def.'s 56.1 Statement at 3-4, Def.'s Resp. 2. For purposes of this motion, only the continuous use of the claimed mark, "Hi-Tech Pharmacal," and its distinctiveness and origin-indicating qualities, are relevant.

Resp. 12; Pl.'s 56.1 Statement ¶ 12.

Hi-Tech advertises its products in trade journals, such as the US Pharmacist and Drug Store News, promotes its products at various trade shows, and solicits business by direct customer contact, such as phone calls or emails. Berrios Decl. ¶ 6; Berrios Dep. at 112, ll. 7-12. Between 1997 and 2006, Hi-Tech spent $5-6 million to promote its branded products and approximately $3 million to promote its generic products. D. Seltzer Decl. ¶ 9.

B. Hi-Tech Pharmaceuticals

Defendant Hi-Tech Pharmaceuticals ("HTP") makes and sells vitamins and other dietary supplements. Declaration of Jeffrey A. Jones ("Jones Decl.") ¶¶ 3-6, Ex. 3. Ninety percent of HTP's products are sexual stimulants and body building and weight loss products; its vitamin sales account for less than 1% of its business. *Id.* ¶¶ 9-10. HTP's products are sold primarily in tablet form, *id.* ¶ 6, whereas many of Hi-Tech's products, including its dietary supplements, are sold in liquid form. D. Seltzer Dep. at 36, ll. 3-23, 38-39, ll. 24-5.

HTP has been using the name "Hi-Tech Pharmaceuticals" or "HTP" and its accompanying logo on products and in advertising since 1990 or 1991. Jones Decl. ¶ 3. At least in recent years, HTP's usual logo has included the words "Hi-Tech Pharmaceutical" and "its initials 'HTP' imprinted on a circle with a stylized helical design running diagonally through the diameter of the circle."[2] *Id.* ¶ 18.

HTP sells its products directly to consumers over the Internet and, like Hi-Tech, in major stores such as Wal-Mart, CVS, and Rite-Aid. Def.'s 56.1 Statement at 12, Def.'s Resp. 19; Pl.'s

---

[2] In a few of the advertisements presented to the court, the words "Hi-Tech Pharmaceuticals" are presented in a different format. *See* Jones Decl., Exs. 7, 12.

56.1 Statement ¶ 19.  HTP promotes its products by sponsoring car races and beauty pageants, advertising on television, radio and in print, producing its own magazine, and participating at trade shows.  Sarney Decl. ¶¶ 17-25.  Over the past five years, HTP has spent approximately $15 million on advertising, and its annual sales have grown from $4.8 million to $33.8 million.  Jones Decl. ¶ 16-17.

HTP has been the subject of a number of regulatory actions and is named as a defendant in a pending criminal prosecution.  In 2003, the Food and Drug Administration ("FDA") began investigating whether certain representations made in HTP's labels and marketing material suggested that its products were drugs rather than dietary supplements.  Declaration of Edmund J. Novotny ("Novotny Decl.") ¶ 8.  The FDA also investigated whether defendant's products contained the chemical compound Taldalafil, which was not approved for sale in the United States at the time.  *Id.* ¶ 9.  The investigation led to a lawsuit filed by the United States against HTP.  Sarney Decl., Ex. 12.   In response, HTP voluntarily recalled the products in issue and agreed to enter into a consent decree.  Novothy Decl. ¶¶ 10-11.  HTP's products have remained in commerce continuously, however, and the FDA has not sought judicial enforcement of the decree.  *Id.* ¶¶ 11-13.

On or about January 13, 2004, the FDA issued a letter advising HTP that, because Taldalafil was "again found" in four of its products, those products "may not be legally marketed in the United States."  Sarney Decl., Ex. 14.  In addition, on November 10, 2004, the Federal Trade Commission ("FTC") filed charges against HTP and other companies, alleging that HTP had misrepresented facts regarding a weight loss product known as Lipodrene.  Novothy Decl. ¶ 16.  That litigation is still pending.  *Id.*  Defendant asserts that it did not manufacture Lipodrene

at the time of the allegations giving rise to the FTC's complaint. *Id.*

In April of 2004, the FDA quarantined some of the defendant's dietary supplements containing ephedrine alkaloids. *Id.* ¶ 17. The status of the FDA rule banning ephedrine alkaloids is presently in litigation. *Id.* ¶ 18.

Finally, in or about September of 2006, the Department of Justice filed an indictment against HTP and its officers, alleging that they conspired to import pharmaceutical drugs from Belize illegally. *Id.* ¶ 20. In a statement reported in the press, the prosecutor on the case contended that:

> The indictment's allegations are disturbing because customers
> thought they were getting legitimate and safe prescription drugs
> over the Internet from Canada at cheaper prices, when in reality
> they received adulterated fakes that were crudely made in an
> unsanitary house in Belize.

Berrios Decl., Ex. 9. Defendant asserts that the government has confused HTP with a Belizean entity of the same name. Novothy Decl. ¶ 20. The criminal charges are pending. *Id.*

C. This litigation

Hi-Tech first became aware of HTP in or about 2001, when it began receiving phone calls asking about HTP's products. Declaration of Anne Siebert ("Siebert Decl.") ¶ 3. In 2002, one of plaintiff's customers mistakenly forwarded to plaintiff a warning letter issued by the FDA regarding HTP. D. Seltzer Decl. ¶ 23. The customer apparently believed that plaintiff was the subject of the letter. Subsequently, in April of 2002, Hi-Tech issued two cease and desist letters to HTP, demanding that it refrain from using Hi-Tech's name. *Id.* ¶ 24, Ex. 20. Plaintiff sent another such letter in March of 2003. *Id.* It is unclear what response – if any – HTP made to these letters, but it clearly did not stop using the "Hi-Tech Pharmaceuticals" name. Transcript of

Oral Argument ("Tr.") at 5, ll. 12-15. The record is also unclear as to why plaintiff did not file its lawsuit until June of 2005, more than two years after the last letter. Tr. at 46-47. The record does, however, reveal the following information about the period from 2001 to 2005.

In her declaration, Anne Siebert, executive assistant to the president of Hi-Tech, states that in or about 2001, she began to receive "a couple of...calls a day" asking about purchasing defendant's product, Stamina-Rx. Siebert Decl. ¶ 3. She also received phone calls about at least one of the defendant's other products, Lipodrene. *Id.* Although the calls were not always logged, plaintiff has submitted a log of some of the calls it received inquiring about defendant or defendant's products as of March 2006. *Id.* ¶ 4. Ten such calls were logged between November 29, 2005 and March 28, 2006. *Id.*, Ex. A. Siebert also asserts that Hi-Tech received emails about defendant's products, including a message from one of plaintiff's customers, asking whether it should return some of defendant's product, StaminaRx, to plaintiff. *Id.* ¶ 5, Ex. C. One of plaintiff's customers also sent plaintiff a "Returned Goods Invoice" for defendant's products. Supplemental Declaration of Anne Siebert ("Siebert Supp. Decl.") ¶ 2, Ex. 1. Another vendor sent a letter to plaintiff regarding a dispute over an outstanding invoice for defendant's product. *Id.* ¶ 3. In another instance, one of defendant's suppliers, Atlantic Sweetener, Co., billed plaintiff for products that were purchased and shipped to defendant. D. Seltzer Decl. ¶ 26. In the course of just a few days at one particular trade show, between twenty and thirty pharmacists approached Hi-Tech's vice president of sales and marketing to ask whether Hi-Tech Pharmacal and Hi-Tech Pharmaceuticals are the same company, or whether the Hi-Tech Pharmaceuticals' booth was part of plaintiff's exhibition. Berrios Decl. ¶ 15.

Plaintiff has also submitted printouts from a website, www.PriceGrabber.com, that lists

"Hi-Tech Pharmacal" as the manufacturer of Lipodrene and other fat-burning and weight loss pills that appear to be HTP's products and are not even made or sold by plaintiff. Sarney Decl., Ex. 18. A printout from www.shopping.msn.com lists both Hi-Tech Pharmacal and Hi-Tech Pharmaceuticals as the manufacturer of HTP's Stamina-Rx, a sexual stimulant. *Id.*, Ex. 19.

As noted above, the FDA placed some of HTP's products under quarantine. In February of 2006, Bloomberg News mistakenly reported that it was plaintiff and not defendant whose products were quarantined by the FDA. D. Seltzer Decl. ¶ 25. As a result of the mistake, plaintiff saw its share price drop from $25.95 to $23.81 in ten minutes. *See* "Stock Plunges After Case of Mistaken Identity," Newsday, (Mar. 1, 2006); D. Seltzer Decl., Ex. 21. Although Bloomberg News ultimately issued a correction, plaintiff's shareholders and investors inquired about the incident, and plaintiff was forced to respond by issuing a press release stating that its products were not the subject of the FDA seizure. *Id.* ¶ 25, Ex. 22.

The criminal prosecution of HTP caused further confusion. As a result of the indictment, plaintiff received inquiries from two of its customers about its involvement. Berrios Decl. ¶ 16. Plaintiff asserts that a buyer for one of these customers, Cardinal Health Care, told plaintiff that Cardinal, upon learning of the criminal charges, began removing plaintiff's products from its system. *Id.* ¶ 17.

### III. Discussion

#### A. Plaintiff's Lanham Act Claim

Plaintiff and defendant cross-move for summary judgment on plaintiff's federal claim of trademark infringement under Section 1125(a) of the Lanham Act. Summary judgment is appropriate where the pleadings, evidence obtained through discovery, and affidavits establish

that there is no genuine issue of material fact and that the undisputed facts entitle the movant to judgment as a matter of law. *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 580 (2d Cir. 1991), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10 (1986); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 868 (2d Cir. 1986). In making this determination, a court must determine whether a reasonable jury could return a verdict for the nonmoving party, and, in doing so, the court will "resolve all ambiguities and draw all inferences against the moving party." *Lang*, 949 F.2d at 580.

"A trademark is any word, name, or symbol, or any combination thereof, used by a person to identify and distinguish his or her goods...from those manufactured or sold by others and to indicate the source of the goods." *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997), *quoting* 15 U.S.C. § 1127 (internal quotation marks omitted). A trade name, or a name used to identify a business, also serves to indicate origin and is entitled to protection under the Act.[3] 15 U.S.C. § 1127. The section of the Lanham Act relevant in this case provides in part:

> (a) Civil action
>
> **(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his

---

[3]"Hi-Tech Pharmacal" – whether a company name (trade name) or a mark of origin (trade mark) – is treated the same in all contexts for purposes of this motion. In both the trade name and mark contexts, the words "Hi-Tech Pharmacal" are an indicator of source and origin.

or her goods, services, or commercial activities by another person, or

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

A plaintiff establishes liability under Section 1125(a) "if it can show [1] that it has a valid trademark entitled to protection and [2] that the defendant's use of it is likely to cause confusion." *Genesee,* 124 F.3d at 142, *quoting Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir. 1995) (internal quotation marks omitted). *See also Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir. 1985). Whether a mark is entitled to protection depends on its classification as to its degree of distinctiveness or whether it has acquired secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S. Ct. 2753, 2757-2758 (1992). Whether there is a likelihood of confusion is determined according to the eight-factor ("*Polaroid* Factors") test originally set forth in *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961).

For purposes of these motions, it is undisputed that plaintiff has been using the mark "Hi-Tech Pharmacal" continuously for a longer period than the defendant has used "Hi-Tech Pharmaceuticals." Plaintiff is therefore the senior user and entitled to priority if it can establish the two elements of liability listed above. *See Dial-A-Mattress Operating Corp. v. Mattress Madness*, Inc., 841 F.Supp. 1339, 1347 (E.D.N.Y. 1994).

The Second Circuit has held that summary judgment "may be appropriate in certain

trademark actions." *Lang*, 949 F.2d at 580 (citing cases). It is also well-settled, however, that the classification of the distinctiveness of a mark is a question of fact. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344-345 (2d Cir. 1999); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039-1040 (2d Cir. 1992). Similarly, the resolution of each of the *Polaroid* factors underlying the determination of likelihood of confusion poses a question of fact, although the ultimate balancing of those factors is a question of law. *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005); *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004) ("Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law.").

### i.) Classification of Plaintiff's Mark

Infringement actions under the Lanham Act encompass both registered and unregistered trademarks. *Virgin Enter. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). Unregistered marks may be protected if they are distinctive.

Some marks enjoy protection because they are inherently distinctive. *Two Pesos,* 505 U.S. at 769, 112 S. Ct. at 2757-2758. A mark that is not inherently distinctive may still enjoy protection if plaintiff establishes evidence that the mark has developed special significance in the marketplace or "secondary meaning." *Id.*

When determining distinctiveness, courts consider where a mark falls along a spectrum comprised of five categories: "(1) generic, (2) descriptive, (3) suggestive, (4) arbitrary or (5) fanciful." *Two Pesos*, 505 U.S. at 768, 112 S. Ct. at 2757.[4] Generic terms, or terms that "refer to

---

[4]Some courts collapse arbitrary and fanciful marks into a single fourth category. *See, e.g., Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 343 (E.D.N.Y. 2007).

the genus or class of which the product is a species," are never protected. *PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 561 (2d Cir. 1990). *See also Genesee*, 124 F.3d at 143. Descriptive terms, or terms that "convey an immediate idea of some characteristic or attribute of the product," while also not inherently distinctive, are entitled to protection, but only if the plaintiff offers proof that the term has acquired "secondary meaning," or "proof that the public has come to associate the term with a particular source." *Papercutter*, 900 F.2d at 562. Suggestive terms – occupying a middle ground – are terms that "require some imagination on the part of the consumer to ascertain the nature of the product" and are entitled to protection even absent any additional showing. *Id.* Finally, arbitrary and fanciful terms are "so distinctive and indicative of a product's *source*" that they are entitled to protection "without the need of debating whether they are merely descriptive." *Id.* (emphasis added and internal quotes omitted).

Plaintiff contends that its mark is arbitrary or suggestive, while defendant argues that plaintiff's mark is not entitled to protection because it is an unregistered, descriptive mark with no secondary meaning. Pl.'s Mem. at 10-11; Def.'s Mem. at 8-14. In determining whether a mark crosses the fine line from suggestive to descriptive, the question is whether the words – taken together – convey "an *immediate* idea of the ingredients, qualities, or characteristics of the goods." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976) (emphasis added). *See also* MCCARTHY § 11:67 ("If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness.").

As previously stated, where a mark fits along the spectrum from generic to fanciful is a question of fact. More specifically,

> [t]he factual issue presented is how the purchasing public views the

> mark. The fact-finder is not the designated representative of the
> purchasing public, and the fact-finder's own perception of the mark
> is not the object of the inquiry. Rather, the fact-finder's function is
> to determine, based on the evidence before it, what the perception
> of the purchasing public is.

*Lane Capital Mgmt.,* 192 F.3d at 344. Thus, a court may classify a mark for purposes of a

summary judgment motion only if the evidence would lead a reasonable fact-finder to only one

conclusion about the purchasing public's perception of the mark's distinctiveness. *Id.* at 348

(reasoning that "if the only evidence is the mark and the product, then the view of the purchasing

public may be divined only if the purchasing public could have only one view, or if one

competing view is dominant enough to permit a reasonable conclusion by the preponderance

standard"). The Supreme Court has cautioned that courts making this determination should not

dissect a mark into its component words for purposes of determining distinctiveness. "The

commercial impression of a trade-mark is derived from it as a whole, not from its elements

separated and considered in detail. For this reason it should be considered in its entirety[.]"

*Estate of P.D. Beckwith, Inc., v. Comm'r of Patents*, 252 U.S. 538, 545-46, 40 S. Ct. 414, 417

(1920); MCCARTHY ON TRADEMARKS § 11:27 (2006).

The public's perception of a mark may be discerned from various types of evidence.

> A mark's common usage and understanding by the relevant public
> may be discerned from any competent source, including consumer
> surveys, testimony of consumers or trade professionals, dictionary
> definitions, uncontested usage of the mark by competitors to
> describe their products, generic usage in newspaper and magazine
> articles, and generic usage by the proponent of the trademark.

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 360 (E.D.N.Y.

2007) (citing cases) (internal quotations and citations omitted). No one source is dispositive of

13

the issue.  *Id.*

Plaintiff has offered very little evidence of public perception of its mark, relying instead primarily upon a common sense interpretation of the words it uses.  Plaintiff contends that its mark is inherently distinctive because it combines "a common term, Hi-Tech" with "the fanciful term, pharmacal, and thereby uses the mark as a whole in an arbitrary way to form a distinctive composite."  Pl.'s Mem. Supp. Mot at 12.[5]  *See also* Pl.'s Reply Mem. at 3-6.  Defendant counters that plaintiff's mark is descriptive because it merely describes the plaintiff's products: pharmaceuticals (i.e., pharmacal), made with or embodying high technology (i.e., hi-tech).  Def.'s Mem at 10.  Defendant offers some evidence in support of this contention, including dictionary definitions of both words and the results of searches on www.google.com, purportedly indicating that both words are commonly used.  Declaration of Michael J. Powell ("Powell Decl."), Exs. 1-4, 7-10.  Defendant also shows that other similar companies, including some that sell medical, dental, or nutritional products, have used the words "Hi-Tech" and "pharmacal" in their trade names.  *Id.*, Exs. 12-14, 17-32.  Finally, defendant presents some evidence that the word "hi-tech" has been used in news articles and on the Internet to describe pharmaceuticals, pharmaceutical companies, and other aspects of the pharmaceutical industry.  *Id.*, Exs. 33-38.

Neither plaintiff nor defendant has presented evidence sufficient to show that a reasonable fact-finder could come to only one conclusion about the distinctiveness of plaintiff's

_____

[5]This rationale actually comes from plaintiff's argument as to strength of its mark, although it is applicable here.  Plaintiff's argument as to the protectibility of its mark is almost entirely conclusory in nature.  *See* Pl.'s Mem. Supp. Mot at 10 ("The use of HI-TECH PHARMACAL in connection with the manufacture and sale of pharmaceuticals and nutritional supplements is neither generic nor descriptive.  Accordingly, it is entitled to protection under the Lanham Act without evidence of secondary meaning.").

mark.  Plaintiff has presented no consumer surveys, no testimony of typical consumers or professional buyers for the chain stores that purchase its products, and no dictionary definitions or other examples of how the words are used independently or as a composite in other contexts. Plaintiff has, therefore, not met its burden of showing that a reasonable fact-finder could only conclude that its mark is suggestive.

Defendant has similarly failed to demonstrate the absence of a genuine issue of material fact in this respect.  Although the defendant offers dictionary definitions of the words "Hi-Tech" and "Pharmacal," dictionary definitions are not dispositive. *Jewish Sephardic*, 478 F. Supp. 2d at 360.  *See also Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 215 -216 (2d Cir. 2003) (noting the importance of taking into account not just the language, but the whole mark, including any "distinctive lettering, coloring, or other design elements," in determining the protectibility of otherwise generic words).  Moreover, although "pharmacal" may be similar enough to pharmaceutical to call the idea of drugs or health-related products to mind, it is not found in all dictionaries, and it is certainly not a commonly used word.  *Compare* Oxford American Dictionary, p. 745 (1999) (containing only pharmaceutical); Random House Dictionary of the English Language, p. 1451 (2d ed. 1987) (same); Webster's II: New Riverside University Dictionary,  pp. 880-881 (1980) (same) *with* Webster's Third New International Dictionary, pp. 1694-95 (2000) (including both words).  The only dictionary defendant points to that includes the word "pharmacal" is a medical dictionary.  *See Merriam-Webster Med. Dict.*, http://dictionary.reference.com/browse/pharmacal  (last visited June 12, 2007).  Similarly, a search for the word "pharmacal" on www.google.com turns up 537,000 results, whereas a search for the word "pharmaceutical" produces over 80 million results. *See also* Powell Decl., Exs. 4-5

(showing similarly disparate results for pharmacal and pharmaceutical). Thus, the rarely used term "pharmacal" may not immediately conjure up an image of pharmaceuticals at all for the ordinary consumer. *See Collyrium v. John Wyeth & Bro.*, 3 N.Y.S.2d 42, 45 (N.Y. Sup. Ct. 1938) (finding that the fact that the word "collyrium" – meaning eye lotion or eye salve – was not in common use among the general public bolstered its distinctiveness). Indeed, the term "pharmacal" might also reasonably be understood by those unfamiliar with its meaning as referring to a chain of drug stores in California or drugs designed to help reduce caloric intake.

Defendant's google searches and evidence of third-party use of the word "hi-tech" also do little to help its position. Extensive third-party use of the word hi-tech may speak to the dilution of the "strength" of the origin-indicating qualities of plaintiff's mark in the marketplace, but it does not necessarily speak to the public's perception of plaintiff's entire mark as conceptually suggestive or descriptive. *Dana Braun, Inc. v. SML Sport Ltd.*, 2003 WL 22832265, *9 (S.D.N.Y. Nov. 25, 2003); *Oxford Indus., Inc. v. JBJ Fabrics, Inc.*, 1988 WL 9959, *4, 6 U.S.P.Q.2d 1756, 1760 (S.D.N.Y. Feb. 2, 1988) ("A mark can be conceptually strong (by being arbitrary or fanciful) and at the same time be commercially weak if the mark lacks significance in the market place for identifying the origin of goods.").

Because the parties here have filed cross-motions for summary judgment, it might seem that they agree that this case does not involve questions of fact. Indeed, in some cases, a mark may be categorized based upon little evidence other than the mark itself and the nature of the product to which it applies. *Lane Capital Mgmt.*, 192 F.3d at 348. *But see, e.g.*, *Courtenay Commc'n*, 334 F.3d at 215 (reversing the district court's dismissal on the basis that the mark "iMarketing News" could not be found to be generic on the basis of the pleadings alone). Other

marks, however, require "[r]azor-thin judgment calls," *Thompson Med.*, 753 F.2d at 212, and summary judgment may not be appropriate on a record as sparse as the one presented here.

Plaintiff's mark does not so clearly require imagination that it can be determined to be suggestive on summary judgment based on little more than the mark itself and the nature of the products plaintiff sells. Courts finding trademarks to be suggestive on such limited proof have typically been addressing less descriptive marks. *See, e.g., Playtex Prods.,* 390 F.3d at 164 (affirming a grant of summary judgment finding "Wet Ones" to be a suggestive mark because, while the product it describes is wet and dispensed one-at-a-time, the name "Wet Ones" "without more, does not itself conjure up the image of a towelette."); *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75 (2d Cir. 1988) (reversing the denial of a preliminary injunction and finding, based on little more than the mark and the nature of the product, that the unregistered mark GUNG-HO as applied to a marine action figure was suggestive because "[i]t takes some imagination even for a child to intuit a swamp-crawling, leech-sucked, bug-bitten marine Sergeant from the term 'GUNG-HO.'"); *Lemme v. Nat'l Broad. Co., Inc.*, 472 F. Supp. 2d 433, 444 (E.D.N.Y. 2007) (holding for purposes of summary judgment that the registered mark "American Dream" was suggestive when applied to a talk show based primarily on the reasoning that "a consumer would not immediately connect American Dream with a Talk Show about People, their Heritage, Goals, Struggles and Dreams."); *Citigroup Inc. v. City Holding Co.*, 171 F. Supp. 2d 333, 345-346 (S.D.N.Y. 2001) (holding, in the context of summary judgment, that "Citicorp," "Citibank," and a whole family of "Citi" marks are suggestive because "Citi" is a coined term and "does not describe banking or financial services, or any features or qualities of financial services and the term CITI is not in any way geographically descriptive because the

business of Citicorp is national and international in scope.").

However, plaintiff's mark also does not fit comfortably among other marks that courts have found to be purely descriptive by relying primarily on the meaning of the words in the mark and mark holder's products themselves. *See, e.g., Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1341 (2d Cir. 1992) (holding that the term arthriticare was descriptive because it indicated the general use (care) of a product for a specific condition (arthritis)); *PaperCutter*, 900 F.2d at 563-564 (holding that the plaintiff's trade name, "Papercutter," was descriptive and required proof of secondary meaning because it conveyed information about plaintiff's products, which were artistic paper designs and cutouts, rather than information about the entity with which those products were associated); *Thompson Med.*, 753 F.2d at 216 (holding that the mark "Sportscreme" was descriptive because "[n]o exercise of the imagination is necessary for the public to understand that the product is a cream useful in connection with sports."); *Ideal World Mktg., Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 244 (E.D.N.Y. 1998) (holding that the unregistered name "Powercheck" used in connection with rechargeable camcorder battery packs was descriptive because "[n]o exercise of the imagination is necessary to perceive that PowerCheck enables a consumer to check, or verify, the power in the battery."); *Sizes Unlimited, Inc. v. Sizes To Fit, Inc.*, 871 F.Supp. 1558, 1563 (E.D.N.Y. 1994) (holding that the names "sizes woman," "sizes unlimited," and "smart size" were descriptive marks because the word "sizes" was used in "the most direct and unimaginative fashion possible" – i.e., to "immediately alert[] the potential customer to what its sponsor deems the most important feature of the product at issue.").

On the record submitted in connection with the pending motions, I conclude that a jury

might reasonably find the plaintiff's mark to be either suggestive or descriptive. The evidence presented by the parties is simply insufficient to preclude a reasonable fact-finder from reaching one decision or the other. Therefore, to the extent the parties' motions rely on a finding that plaintiff's mark fits in one of these categories, summary judgment must be denied because the parties' submissions raise a genuine issue of material fact as to the public's perception of the mark.

### ii.) Secondary Meaning of Plaintiff's Mark

This conclusion, however does not end the analysis. Plaintiff's mark may be entitled to protection even if it is merely descriptive, provided that the mark has acquired "secondary meaning." A showing of secondary meaning establishes that, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Bristol-Myers Squibb*, 973 F.2d at 1041, *quoting Inwood Labs. v. Ives Labs.,* 456 U.S. 844, 851 n. 11, 102 S. Ct. 2182, 2187 n. 11 (1982). "Secondary meaning is an essentially factual determination, proof of which 'entails vigorous evidentiary requirements.'" *Id.*, *quoting Thompson Med.*, 753 F.2d at 217 (internal quotations and citations omitted). The burden of establishing secondary meaning rests with the party asserting rights in the mark; here that burden lies with the plaintiff. *Id.* Moreover, plaintiff's burden is to establish that its mark acquired secondary meaning *before* defendant began using its allegedly infringing mark. *Jewish Sephardic*, 478 F. Supp. 2d at 344, *citing PaperCutter,* 900 F.2d at 564.

A plaintiff may prove secondary meaning through a variety of different types of evidence, including consumer surveys, advertising efforts, sales volume, media coverage, and length and

exclusivity of the use of the mark. *Jewish Sephardic*, 478 F. Supp. 2d at 344-345 (citing cases).

Here, plaintiff has provided almost no evidence of secondary meaning. Plaintiff has put forth no

consumer surveys indicating that relevant consumers associate plaintiff's products with its trade

name. With regard to advertising expenditures, plaintiff asserts that it has spent $3 million on

advertising in connection with the Hi-Tech Pharmacal mark from 1997 to the present. D. Seltzer

Decl. ¶ 9; Pl.'s Mem. at 13. The size of this figure aside, plaintiff has not shown that any

significant advertising took place to establish secondary meaning before the defendant began

using its allegedly infringing mark in 1990 or 1991. Similarly, the growth in plaintiff's sales

from 1989 to 2005, ultimately reaching $68 million annually, fails to establish that the mark

acquired secondary meaning *before* the defendant began using it. Plaintiff has also not shown

that it received any sort of meaningful unsolicited media coverage or that the length and

exclusivity of its use of the "Hi-Tech Pharmacal" mark enhanced the origin-indicating quality of

its mark in the eyes of the relevant purchasing group. For all of these reasons, I find that plaintiff

has failed to meet its burden to show that its mark has acquired secondary meaning during the

relevant period of time.

Because I find that a genuine issue of material fact exists with regard to the

distinctiveness of plaintiff's mark and with regard to whether plaintiff's mark has acquired

secondary meaning, I do not reach the issue of whether there was a likelihood of confusion based

on the eight *Polaroid* factors.[6] *See Thompson Med.*, 753 F.2d at 213 ("The classification of a

---

[6]I do note, however, that plaintiff has made a strong showing that there was not just a *likelihood* of confusion, but rather that relevant consumers were actually confused. *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 141-42 (2d Cir.1999) ("Evidence that confusion has actually occurred is of course convincing evidence that confusion

particular term represents merely a threshold determination. After a mark has been duly

catalogued and its eligibility for protection has been determined, we must then examine a litany

of factors to evaluate whether consumers are likely to be confused as to the source of the

product.").   For the reasons stated above, plaintiff's and defendant's cross-motions for summary

judgment on the Section 1125(a) Lanham Act claim are denied.

B. Plaintiff's State Law Claims

Defendant has moved for summary judgment on each of plaintiff's state law claims.  I

address each aspect of defendant's motion in turn below.

*i.) Common Law Trademark-related Unfair Competition & Misappropriation*

Plaintiff's complaint asserts claims for common law trademark-related unfair competition

and common law misappropriation.  Plaintiff's complaint appears to allege that defendant has

engaged in unfair competition by virtue of its alleged infringement of plaintiff's mark.  Compl.

¶¶ 18-22.  To establish such a claim under New York law, a plaintiff must show (1) defendant's

bad faith and (2) actual confusion or a likelihood of confusion.  *Deere & Co. v. MTD Holdings*

---

is likely to occur.").  Websites have mislabeled defendant's products as plaintiff's products.
Customers returned defendant's goods to plaintiff.  Potential customers phoned or emailed
plaintiff wishing to buy defendant's products.
    Plaintiff has also shown that the defendant's alleged misconduct – when coupled with the
confusion as to the source of defendant's goods – has had a damaging and negative impact on
plaintiff's reputation and dealings with its customers.  *Lang*, 949 F.2d at 582-83.  Here, one of
the plaintiff's customers forwarded a warning letter from the FDA regarding the defendant,
apparently in the mistaken belief that the letter concerned plaintiff's activities.  The Bloomberg
News report erroneously stating that plaintiff's, rather than defendant's, products were seized
caused plaintiff's stock to drop and customers and investors to question plaintiff's involvement.
Perhaps most importantly, when the defendant was indicted, one of plaintiff's customers
mistakenly believed that plaintiff had been charged and even began to remove plaintiff's
products from its system.

*Inc.,* 2004 WL 324890, *18 (S.D.N.Y. Feb. 19, 2004), *citing Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc*., 58 F.3d 27, 34-35 (2d Cir. 1995). *See also Genesee Brewing Co.*, 124 F.3d at 149 ("[Plaintiff's] *state law* claim of unfair competition is not viable without a showing of bad faith."); *Girl Scouts of U.S. of Am. v. Bantam Doubleday Dell Pub. Group, Inc.*, 808 F. Supp. 1112, 1131 (S.D.N.Y. 1992) ("Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent."). The same showing of bad faith must be made for a claim of common law misappropriation. *See Jeffrey Milstein*, 58 F.3d at 34 ("The essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'"), *quoting Rosenfeld v. W.B. Saunders, A Div. of Harcourt Brace Jovanovich, Inc.,* 728 F.Supp. 236, 249-50 (S.D.N.Y. 1990); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980).

Defendant denies having acted in bad faith. It asserts that it was unaware of Hi-Tech Pharmacal when it began using the mark Hi-Tech Pharmaceuticals, and that it never intended to benefit from Hi-Tech Pharmacal's advertising or trade off of its reputation. Jones Decl. ¶¶ 27-29. In response, plaintiff has been unable to produce any evidence of defendant's bad faith. Plaintiff conceded at oral argument that it had no evidence of bad faith on the part of the defendant in its adoption of its mark. Tr. at 5, ll. 1-8. For example, there is no evidence that defendant intentionally copied its mark from plaintiff. *Cf. Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 753 -754 (2d Cir. 1996). Nor is there any evidence that defendant conducted an incomplete trademark search or ignored the advice of counsel in

adopting its mark; in fact, as noted above, plaintiff never registered "Hi-Tech Pharmacal." *See id.* at 754. Moreover, defendant's continued use of its mark after the cease and desist letters cannot by itself constitute evidence of bad faith. *Something Old, Something New, Inc. v. QVC, Inc.*, 1999 WL 1125063, *7 (S.D.N.Y. Dec. 8, 1999) ("Defendant's failure to completely abandon the use after receiving a cease and desist letter is insufficient to support an allegation of bad faith."), *citing Wonder Labs, Inc. v. Procter & Gamble, Co.*, 728 F.Supp. 1058, 1064 (S.D.N.Y.1990). Finally, plaintiff has presented no evidence that defendant's persistence in the use of its mark during the course of this litigation represents anything but a good faith belief that it is entitled to do so because plaintiff's mark is not protectible – an argument that I have already found to be at least colorable, as indicated above. *Cf. Int'l Star Class Yacht Racing Ass'n*, 80 F.3d at 754 (holding that persistence in using a mark during litigation that defendant had intentionally copied, and after a search had revealed the mark's registration, was evidence of bad faith). In the absence of any showing of bad faith by the plaintiff, defendant's motion for summary judgment on the unfair competition and misappropriation claims is granted, and those claims are hereby dismissed.

### ii.) Unfair and Deceptive Trade Practices

Defendant also seeks summary judgment on plaintiff's claim under Section 349 of the N.Y. General Business Law, prohibiting "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y.Gen.Bus.Law § 349 (McKinney 2007). To establish liability under this section, a plaintiff must show: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *U-Neek, Inc. v. Wal-Mart Stores, Inc.,* 147 F. Supp. 2d 158, 176 (S.D.N.Y. 2001),

*citing Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).

Because the purpose of the statute is consumer protection, "the gravamen of the complaint must be consumer injury or harm to the public interest." *Something Old, Something New,* 1999 WL 1125063, at *11, *quoting Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995). *Compare Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 552 (S.D.N.Y. 2003) (dismissing a Section 349 claim in a trade dress infringement action – where the defendant made a type of pants highly similar to plaintiff's – because the core of the claim was harm to the business and not the consumer), *with Vitabiotics, Ltd. v. Krupka,* 606 F.Supp. 779, 785 (E.D.N.Y. 1984) (granting summary judgment to a plaintiff on a Section 349 claim where the evidence showed that defendant, after ending its relationship as plaintiff's distributor, deliberately marketed vitamins under the same name as plaintiff's brand and that defendant's vitamins contained illegal substances). Thus, to proceed on a Section 349 claim in the context of a trademark dispute, a plaintiff is required to show that the defendant's behavior was "the sort of offense to the public interest which would trigger" an FTC investigation under 15 U.S.C. § 45. *Something Old, Something New*, 1999 WL 1125063, at *11.

The record before the court includes several allegations of wrongful conduct by the defendant for violating laws and regulations administered by the FTC and FDA. This type of alleged conduct, if it occurred, is surely consumer-oriented and a significant threat to the public's interest in safe, clearly labeled drugs and dietary supplements. However, these allegations do not form the core of the plaintiff's claim for trademark infringement here. *See* Compl. ¶¶ 23-26. The FTC action cited by plaintiff is only tangentially related to some of the specific instances of actual confusion alleged in plaintiff's motion papers. Accordingly, defendant's motion for

summary judgment on plaintiff's Section 349 claim is granted.

*iii.) Dilution*

Defendant seeks summary judgment on plaintiff's claim under New York's anti-dilution

statute.  N.Y. Gen.Bus.Law. § 360-l (McKinney 2007).  That section provides:

> Likelihood of injury to business reputation or of dilution of the
> distinctive quality of a mark or trade name shall be a ground for
> injunctive relief in cases of infringement of a mark registered or
> not registered or in cases of unfair competition, notwithstanding
> the absence of competition between the parties or the absence of
> confusion as to the source of goods or services.

N.Y.Gen.Bus.Law § 360-l.[7]  To prevail on a claim under this statute, a plaintiff must

demonstrate (1) a mark of truly distinctive quality or with secondary meaning and (2) a

likelihood of dilution.  *Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39, 42 (2d Cir. 1994);

*Le Book Pub., Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 313 (S.D.N.Y. 2005).

In its interpretations of this Section, the Second Circuit has held that it "protects only extremely

strong marks."  *Bristol-Myers Squibb,* 973 F.2d at 1049, *quoting Sally Gee, Inc. v. Myra Hogan,*

*Inc.*, 699 F.2d 621, 625 (2d Cir. 1983).  *See also Strange Music, Inc. v. Strange Music, Inc.*, 326

F. Supp. 2d 481, 496 (S.D.N.Y. 2004) ("While this does not mean that the mark must be famous,

weak marks will not be subject to a dilution claim under this statute.").

As established above, I conclude that there is a genuine issue of material fact regarding

whether plaintiff's mark is inherently distinctive or has acquired secondary meaning.

Accordingly, I do not reach the "likelihood of dilution" prong of the test.  *Strange Music*, 326 F.

---

[7]This section was previously codified at 368-d.  Because the text has remained identical,
it is appropriate to examine case law prior to the re-codification when analyzing this claim.

Supp. 2d at 496.  Summary judgment on plaintiff's dilution claim would be inappropriate on the record before the court.  Defendant's motion as to the state law dilution claim is denied.

### IV. Conclusion

For the foregoing reasons, the parties' respective cross-motions for summary judgment on plaintiff's Lanham Act claim and defendant's motion for summary judgment on plaintiff's dilution claim are denied.  Defendant's motion for summary judgment on plaintiff's unfair competition, misappropriation, and Section 349 unfair and deceptive trade practices claims is granted.  The court will schedule a conference to address the further progress of this litigation by separate order.

**SO ORDERED.**

**_____/s/_____**

**Steven M. Gold**
**United States Magistrate Judge**

**Brooklyn, New York**
**July 5, 2007**

*U:\JB 2006-2007\Hi Tech Mot 07032007.wpd*